**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4888-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

EUGENE BELTON,

     Defendant-Appellant.

_____

Submitted June 1, 2020 – Decided June 26, 2020

Before Judges Sumners, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 76-03-0377.

Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Ali Y. Ozbek, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

In 1976, defendant Eugene Belton was sentenced to a life term for murder and was initially eligible for parole after serving less than seventeen years. A few years before Belton reached his first parole eligibility date, he participated in a prison riot and was criminally prosecuted and convicted, receiving a consecutive term of fifteen years' imprisonment with seven-and-one-half years of parole ineligibility. Thereafter, he was repeatedly denied parole. In 2014, the Parole Board (Board) imposed a 144-month future eligibility term (FET).

After unsuccessfully appealing the Board's decision, Belton moved to correct an illegal sentence under State v. Zuber, 227 N.J. 422 (2017). The motion court denied the application, determining that his sentence was not the functional equivalent of life without parole and his prolonged imprisonment was due primarily to his inmate infractions and conviction for crimes committed while incarcerated. In this appeal, Belton challenges that decision.

I.

In March 1976, Belton and a co-defendant were indicted under Title 2A—which has since been repealed and replaced by Title 2C—on the following charges in relation to a January 1976 incident: murder, N.J.S.A. 2A:113-1; armed robbery, N.J.S.A. 2A:151-5; robbery, N.J.S.A. 2A:141-1; conspiracy to

commit robbery, N.J.S.A. 2A:98-1; and entering a dwelling with intent to steal, N.J.S.A. 2A:94-1. Belton was seventeen years old at the time.

The following month, two additional indictments were returned against Belton. The first charged him with an October 1974 assault with the intent to rob, N.J.S.A. 2A:90-2. The second charged, in relation to a November 1974 incident, escape from a youth corrections center, N.J.S.A. 2A:104-6; entering with intent to steal, N.J.S.A. 2A:94-1; and theft of a vehicle, N.J.S.A. 2A:119-2.

Belton was waived to adult court. In April 1976, Belton entered a plea of non vult to the January 1976 murder charge and the November 1974 entering with intent to steal charge in exchange for dismissal of the remaining charges.

At the plea hearing, Belton testified he had completed the sixth grade and was able to read and write English "a little bit." He acknowledged that he understood that by pleading non vult to murder he could be sentenced to life imprisonment.

Belton admitted that on January 23, 1976, he went to an apartment in Paterson with a knife intending to commit robbery. He and his co-defendant pushed open the door and he stabbed the victim in the throat. While looking for

money to steal, Belton saw a hammer and used it to strike the victim on the head causing his death. Belton then stole a television.

Belton also admitted that on November 3, 1974, he broke into a garage in Wayne and stole a vehicle. Belton said he understood the penalty for this offense was up to seven years' imprisonment or a $2000 fine. The trial court accepted both guilty pleas.

During the sentencing hearing, defense counsel urged the court to recommend placement in a reformatory, arguing that "all of the authorities seem to think he needs some kind of a structural environment." Counsel asserted that when Belton was five years old his mother died, and his father abandoned the family. "From that point up until today . . . all he did was drift from foster home to foster home, institution to institution."

Counsel argued that no one except one of his sisters cared what happened to Belton. His behavior in the institutions was aggressive and assaultive, and while the institutions made recommendations for him, counsel alleged Belton never received the "psychological or psychiatric help, which he obviously need[ed]." Counsel urged the court to not "double up on him at this juncture" by imposing consecutive terms and by placing him in prison with adults. Given Belton's aggressive behavior, psychiatric problems, and young age, counsel

argued that placing him in adult prison would be "pretty much the end of this fellow."

The State urged the court to impose the maximum term of life imprisonment for the murder due to the heinous and "extremely violent" nature of the crime. It sought a consecutive term for the November 1974 breaking and entering, based on Belton's criminal history.

The sentencing court imposed a term of life on the murder conviction and a concurrent term of six-to-seven years on the breaking and entering conviction. Both judgments of convictions recommended transferring Belton to the New Jersey Youth Correction Institution for the beginning of his term.

In so sentencing Belton, the court began by stating: "It's a terrible thing to see you before this [c]ourt charged with an offense of this type at [age seventeen]." The court said that it had never seen "such a completely anti-social person" who had "completely refused to accept the fact that you are part of society and as part of society you do owe certain obligations to society just as we owe to you." The court noted that the amount of time Belton would serve in prison depended on his activities while incarcerated. The court declined to impose consecutive terms because it did not "think any purpose would be served" by doing so.

A-4888-17T2

Belton appealed his sentence. We affirmed, explaining that "the entire record, including the circumstances attendant upon the commission of these offenses and the presentence report (inclusive of defendant's prior convictions), satisfies us that the sentences are neither unduly punitive nor manifestly excessive." State v. Belton, No. A-0331-76 (App. Div. May 1, 1978) (slip op. at 1-2).

Belton was not a model prisoner. From October 1976 to August 1987, Belton was found guilty of thirty-nine serious asterisk infractions,[1] which included: fighting; conduct that interfered with or disrupted prison security; possession of drugs or a prohibited substance; threatening another; engaging in or encouraging group demonstration; rioting; assault; and weapon possession. From October 1976 to January 1990, he was found guilty of sixty-two additional infractions, which included: refusing to obey an order; being in an unauthorized area; unexcused absence from work or assignment; obscene or abusive language; unauthorized possession of an object; interfering with the taking of a count; failing to stand count; possession of another's property; destroying or damaging

---

[1] Asterisk infractions denote the most severe offenses committed by an inmate. See N.J.A.C. 10A:9-2.13(a), (b), (c).

property; failure to follow safety or sanitary regulations; and refusing to work or accept an assignment.

In August 1990, when he was thirty-two years old, Belton participated in a prison riot that prison authorities believed he and his cohorts had organized and preplanned. According to prison records, Belton and four other inmates used shanks and five-pound weights to attack seven unarmed prison guards in a gym corridor, including a captain and senior officer. Belton and two others stabbed the captain "in the face and head and bludgeoned him in the head with a weight." The captain also suffered a collapsed lung.

Belton and his cohorts "stabbed and bludgeoned" the senior officer "into an unconscious state." They "struck [his] head, stabbed and kicked [him] repeatedly and his cheekbone was crushed by a weight." Another officer was forced into an area where Belton and his cohorts "repeatedly tried to stab him in the face." The five inmates then fled the attack and fought the responding officers.

In May 1991, a grand jury indicted Belton and the other four inmates on multiple charges relating to the riot. A jury convicted Belton of four counts of varying degrees of aggravated assault and possession of a weapon for an unlawful purpose.

On July 30, 1993, the sentencing court imposed an aggregate term of twenty-one years and six months' imprisonment with a parole-bar of ten years and nine months to run consecutively to his life sentence. Belton successfully appealed this sentence, and on September 26, 1997, he was resentenced to an aggregate term of fifteen years' imprisonment with seven-and-one-half-years of parole ineligibility, to run consecutively to his life sentence.

In 2006, Belton was first denied parole due to his extensive criminal history, the substantial likelihood that he would commit another crime, prison infractions, a lack of deterrence, and a lack of attempt to participate in programs.

The following year he was again denied parole for similar reasons. By that point, he had incurred a total of 127 institutional infractions from October 1976 to September 2003, forty-three of which were considered serious. The Parole Board found that he continued to minimize his participation in his crimes, displayed insufficient problem resolution skills, and tended to react to stress and confrontation with violent behavior. However, the panel also recognized as mitigating factors that Belton had participated in some programs, attempted to enroll in others but was not admitted, received "average" institutional reports, and had commutation credits restored.

A-4888-17T2

In December 2010, Belton was denied parole. The Board panel found that he also had a substance abuse problem that he had not sufficiently addressed and that while he was "beginning to direct his attention to his criminal thinking," he "remain[ed] unaware of the depth of his anger." In June 2012, the Parole Board once again denied parole for similar reasons.

In June 2014, a two-member Board panel denied parole, writing that Belton "need[ed] to address some emotional/mental issues; especially anger issues" and did not have an adequate plan to assist him with reintegration. As mitigating factors, the panel recognized that his last infraction was in 2003 and he had participated in various programs since. Belton sought further review. In November 5, 2014, a three-member Board panel denied parole and imposed a 144-month FET, concluding that "the depth of [Belton's] pathology renders the usual presumptive [twenty-seven-month] FET insufficient."

In its January 26, 2015 decision, a three-member Board panel found there was little evidence that anything had reduced Belton's "propensity for criminal and antisocial activity." The panel wrote that Belton's early criminal behavior, which began at age eight when he set fire to a chair and inappropriately touched a younger child, had progressed with time and resulted in placement in the State Home for Boys (SHB) by age twelve. SHB reported that Belton "made no

9

progress" and became "more aggressive, insubordinate and assaultive" while there. A psychiatric evaluation concluded he was "emotionally explosive under stress." The panel noted that his criminal behavior also included three robberies, arson, burglary, and larceny before he committed the murder.

According to the panel, his record while in prison did not show that he had progressed from an angry child to a "balanced individual who no longer presents as a substantial threat of criminal activity." When asked to explain why he had committed the murder at age seventeen, Belton repeatedly blamed it on being under the influence of alcohol, heroin, and cocaine, which he claimed he had begun using "routinely" by age twelve. He expressed remorse for what he had done and said, "emotionally, I was dealing with a lot." According to the panel, his responses, coupled with the heinous nature of the murder, the numerous infractions he had committed in prison, and the assaultive behavior he exhibited during the 1990 prison riot, demonstrated that he still lacked insight into his criminal behavior.

The panel also found that Belton had no plan to address his substance abuse issues, seek employment, and secure housing if he were released. Belton indicated he planned to live in an unspecified "placement" setting and obtain a job, hopefully as a guidance counselor, before requesting permission to move to

the South to be with his family. Belton was then fifty-five years old and had no more than a seventh-grade education. The panel deemed his intention to work as a guidance counselor, which required at least a bachelor's degree, to be unrealistic. His plan to live in a "placement" facility, with no other support and no job skills, was insufficient. Further, while he had participated in a narcotics abuse program, he still had "no insight" into his addiction, stressors, and factors that contributed to his criminal behavior.

The panel considered Belton's mitigation letter, in which he claimed he better understood his behavior and had taken steps to "adopt[] rehabilitative techniques" that he had learned in the programs he completed. Belton underscored that he had remained infraction free for the past eleven years. The panel found these steps did not outweigh the factors supporting a FET far beyond the presumptive term. Based on the 144-month FET, less commutation credit he had earned, the panel noted that Belton's parole eligibility date was March 7, 2023, but if he continued to accrue work credits, that date could be further reduced.

Belton filed an administrative appeal of the panel's decision; it was affirmed by the full Parole Board. Belton appealed the parole denial and FET to this court. We affirmed, finding that the Parole Board's decision was not

11

arbitrary, capricious, or unreasonable and was supported by substantial and credible evidence in the record. Belton v. State Parole Bd., No. A-4181-14 (App. Div. Aug. 3, 2017) (slip op. at 5-7).

Belton then moved to correct an illegal sentence under Miller v. Alabama, 567 U.S. 460 (2012), and Zuber. Belton argued he was seventeen years old when he committed the original offenses, he was now a changed person, and his de facto life sentence violated the prohibition against cruel and unusual punishment. Belton also asserted that the sentencing court did not consider that he acted under the influence of his adult co-defendant.

The motion court assigned counsel to represent Belton. Counsel argued that the motion court should reduce Belton's sentence under the Miller factors because he was serving the functional equivalent of life without parole. Counsel contended that Belton's childhood had been chaotic and that his juvenile offenses and the homicide were substantially the result of the lack of a stable family structure and absence of emotional support.

The State argued that parole eligibility for a life sentence under Title 2A was far different than under Title 2C, noting that under Title 2C, a life sentence would result in sixty-three years and nine-months of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. The State contended that

Belton remained imprisoned because of the heinous crimes and numerous infractions he committed while in prison, coupled with his failure to recognize the underlying reason for his violent behavior; concerns about his resumption of drug use if released; and the lack of any plan for housing upon release. The State further argued that the facts and sentences imposed in Graham v. Florida, 560 U.S. 48 (2010) (upon which Miller was partially premised), Miller, and Zuber, were readily distinguishable from this case.

Following oral argument, the motion court issued a May 1, 2018 order denying Belton's motion. In its subsequent written statement of reasons, the court comprehensively reviewed the crimes Belton committed, his plea agreement, the sentencing process, his inmate infractions, and the parole decisions. It explained that the sentencing court had considered Belton's youth and his difficult upbringing when it sentenced him in 1976, that he had been previously eligible for parole, and that he was denied parole because of his behavior in prison, which this court affirmed.

The motion court noted Belton's "sad and chaotic childhood" and that "he was raised primarily in foster homes, as well as in a juvenile reformatory," after his mother died and his father left the family when he was five years old. The

court found these circumstances had a "devastating" and "tragic" impact on his childhood.

The Parole Board advised the motion court that Belton's initial parole eligibility date for his life sentence was September 28, 1992—sixteen years, four months, and eighteen days from his date of sentence. That date considered the award of 109 days of jail credit and the application of 3027 days of projected commutation credit. The Parole Board noted his parole eligibility date could have been further reduced to November 28, 1991, by applying the 305 days of work credit Belton had earned. Inmates serving a life term imposed under Title 2A generally become eligible for parole in the range of fourteen and one-half years to fifteen and one-half years.

The court noted that the Miller and Zuber factors "are largely intertwined with the factors considered by the Parole Board." It emphasized that the assaults of the corrections officers in 1990 were committed when Belton was thirty-two years old. Further, his "multiple and serious institutional infractions spanned the first twenty-seven years of his custodial term." Moreover, "Belton had already accumulated a long and serious and violent juvenile offender history" before committing the murder.

A-4888-17T2

The court found Belton has remained in prison far beyond his initial parole eligibility date "as a direct result of his post-sentence behavior while in prison" and the reasons cited by the Parole Board.

This appeal followed. Belton raises the following single point:

> BELTON'S LIFE SENTENCE WAS IMPOSED WITHOUT PROPER CONSIDERATION OF HIS YOUTH, DESPITE THE FACT THAT HE WAS A JUVENILE AT THE TIME OF THE OFFENSE. ACCORDINGLY, THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO CORRECT AN ILLEGAL SENTENCE, MADE PURSUANT TO MILLER V. ALABAMA AND STATE V. ZUBER.

II.

In Miller, 567 U.S. at 479, the Supreme Court declared mandatory life imprisonment without parole for a juvenile sentenced as an adult unconstitutional under the Eighth Amendment. In so ruling, the Court built upon prior decisions, which recognized that "children are constitutionally different from adults for purposes of sentencing" because they "have diminished culpability and greater prospects for reform," and thus "'are less deserving of the most severe punishments.'" Id. at 471 (quoting Graham, 560 U.S. at 68).

The Miller Court stated that a mandatory life sentence without parole for a juvenile convicted of homicide:

[1] precludes consideration of [the juvenile's] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.

[2] It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.

[3] It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.

[4] Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.

[5] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

[567 U.S. at 477-78.]

Miller did not preclude the possibility of a life sentence for a juvenile but reaffirmed the determination made in Graham that such a sentence may not be mandatory and should be "uncommon" given a juvenile's "diminished culpability and heightened capacity for change." Miller, 567 U.S. at 479. In the "rare" situation where the juvenile's "crime reflects irreparable corruption" or

16

incorrigibility, the court may impose a life sentence. Id. at 479-80 (quoting Roper v. Simmons, 543 U.S. 551, 573 (2005)).

In Graham, the Court determined that a sentencing court may not make the determination "at the outset" that the juvenile will forever pose a risk to society. 560 U.S. at 75. The juvenile must have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Ibid. The Court left the "means and mechanisms for compliance" with its decision to the States. Ibid.

In Montgomery v. Louisiana, the Court determined that Miller was entitled to retroactive effect and held that where a sentence was imposed contrary to Miller, the constitutional infirmity could be remedied by a resentencing or consideration for parole. 577 U.S. ___, 136 S. Ct. 718, 733-36 (2016). The Court explained: "Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity— and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." Id. at 736.

In Zuber, our Supreme Court extended the holding of Miller to any life sentence without parole or its functional equivalent. 227 N.J. at 447-48. The Court held that when a juvenile is tried as an adult and is subject to a lengthy

17

aggregate term that is "the practical equivalent of life without parole," the sentencing court must consider the Miller factors in addition to the aggravating and mitigating sentencing factors set forth in N.J.S.A. 2C:44-1(a) and (b). Zuber, 227 N.J. at 429, 445-47, 450.

Where consecutive terms are an option, the court must consider the Yarbough[2] factors under "a heightened level of care." Id. at 450. While the Court did not define the meaning of a "heightened level of care," it couched it in terms of the "concerns that Graham and Miller highlight" and the "overriding importance" of Miller. Ibid. Like the Miller Court, the Court in Zuber did not preclude the possibility of a life sentence for a juvenile but instructed that few juveniles should receive de facto life terms because "it is only the 'rare juvenile offender whose crime reflects irreparable corruption.'" Id. at 451 (quoting Miller, 567 U.S. at 479-80).

The Zuber Court did not define a de facto life term by any specific length and rejected the use of life expectancy tables in deciding whether a lengthy term is effectively a life term. Id. at 450. The Court instructed sentencing courts to consider "the real-time consequences of the aggregate sentence." Id. at 447.

---

[2]  State v. Yarbough, 100 N.J. 627, 643-44 (1985).

A-4888-17T2

It suggested the possibility that a lawfully imposed sentence of life, or the functional equivalent of life, may later be rendered unconstitutional by subsequent facts that establish reform and rehabilitation before expiration of the parole bar. Id. at 451-52. The defendant might "ask the court to review factors that could not be fully assessed when he was originally sentenced—like whether he still fails to appreciate risks and consequences, or whether he may be, or has been, rehabilitated." Id. at 452 (citing Miller, 567 U.S. at 477).

In State v. Bass, we addressed the length of sentence that may qualify as a de facto life term. 457 N.J. Super. 1, 13-14 (App. Div. 2018), certif. denied, 238 N.J. 364 (2019). We held that a life sentence with a thirty-five-year parole-bar imposed on a juvenile was not the functional equivalent of a life sentence, and thus, the defendant was not entitled to resentencing under Zuber, even though the sentencing court had not considered the Miller factors when it imposed sentence. Ibid. We further held that any rehabilitative actions the defendant had taken while incarcerated were matters for the parole board to consider and did not render the sentence unconstitutional. Id. at 14. We explained:

> [D]efendant's sentence is not illegal because he now claims to be rehabilitated as a result of his incarceration. We do not minimize defendant's efforts to rehabilitate himself . . . . However, consideration of

these accomplishments is exclusively the province of the parole board and not a means of collateral attack on defendant's sentence—which has been affirmed on direct appeal.

[Ibid.]

Belton contends the motion court erred in denying his motion to correct an illegal sentence because he was sentenced to life sentence for the murder he committed when he was seventeen years old and under Zuber, a court may not impose a life sentence, or a de facto life sentence, without first considering the Miller factors. He argues the sentencing court did not properly consider his youth or the Miller factors, and the mere possibility of parole is insufficient to satisfy Zuber.

Belton claims a court must consider the real-time he has served in prison and underscores that he has now been incarcerated over forty-four years. He labels the reasons for denying his most recent requests for parole as "hollow and circular." He emphasizes that his most recent infraction was in 2003 and that his failure to provide a suitable release plan should be understandable given the length of his incarceration. He also notes that the Parole Board did not consider his youth or the Miller factors. We are unpersuaded by these arguments.

We reject the contention that Belton received the functional equivalent of life without parole. He received a life sentence subject to a parole-bar of less

20

than seventeen years for the murder he committed at age seventeen. He was initially eligible for parole when he was thirty-three or thirty-four years old, depending on the amount of work credits he earned. We adhere to the reasoning in Bass. A life sentence with a less than seventeen-year parole-bar was not the functional equivalent of a life sentence, and thus, Belton was not entitled to resentencing under Zuber, even though the sentencing court had not considered the Miller factors. The rehabilitative actions Belton has taken while incarcerated are matters for the Parole Board to consider and did not render the sentence unconstitutional.

Belton remains imprisoned for four principal reasons. First, his conduct in prison, from 1976 to 2003, was abysmal. He incurred some 127 infractions, forty-three of which were serious. As a result, he received sanctions, including the loss of commutation and work credits. Second, he committed new serious crimes in prison, at age thirty-two, for which he ultimately received an aggregate consecutive fifteen-year sentence with seven-and-one-half years of parole ineligibility. Third, the Parole Board imposed a 144-month FET for reasons we previously found supported by the record. Fourth, the Parole Board remained concerned about Belton's unresolved anger issues, lack of insight into why he

21

committed the homicide, future substance abuse, and lack of suitable living arrangements.

Belton committed every prison infraction and the riot-related crimes as an adult, after he was sentenced for the murder. His defiant conduct while serving his murder sentence refutes any claim that he is reformed and rehabilitated. Further, the murder and other crimes Belton committed hardly "reflect[s] only transient immaturity." Montgomery, 136 S. Ct. at 736.

More fundamentally, we are unaware of any published opinion that has extended the principles announced in Miller and Zuber to prolonged incarceration primarily resulting from prison infractions. We decline to do so.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22                                                          A-4888-17T2